IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| W. SCOTT HARKONEN, M.D., | No. C 12-629 CW |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (Docket No. 8) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 21) |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE; and UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, | |
| Defendants. | |

_____/

This case arises out of Defendant United States Department of Justice (DOJ)'s denial of Plaintiff W. Scott Harkonen's multiple requests for correction of a press release that DOJ disseminated announcing Plaintiff's criminal conviction for wire fraud. Plaintiff seeks review of these denials and brings facial and as-applied challenges to the information quality guidelines promulgated by DOJ and co-Defendant United States Office of Management and Budget (OMB). Defendants move to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff opposes and cross-moves for summary judgment. Having considered the papers filed by the parties and their arguments at the hearing, the Court GRANTS Defendants' motion to dismiss and DENIES Plaintiff's motion for summary judgment.

BACKGROUND

I.   Statutory and Administrative Framework

A. The Information Quality Act (IQA)

The IQA, which was enacted in 2000, provides in full:

(a) In general.  The Director of the Office of
Management and Budget shall, by not later than September
30, 2001, and with public and Federal agency
involvement, issue guidelines under sections 3504(d)(1)
and 3516 of title 44, United States Code, that provide
policy and procedural guidance to Federal agencies for
ensuring and maximizing the quality, objectivity,
utility, and integrity of information (including
statistical information) disseminated by Federal
agencies in fulfillment of the purposes and provisions
of chapter 35 of title 44, United States Code, commonly
referred to as the Paperwork Reduction Act.

(b) Content of guidelines.  The guidelines under
subsection (a) shall--

    (1) apply to the sharing by Federal agencies of,
and access to, information disseminated by Federal
agencies; and

    (2) require that each Federal agency to which the
guidelines apply--

        (A) issue guidelines ensuring and maximizing
the quality, objectivity, utility, and
integrity of information (including
statistical information) disseminated by the
agency, by not later than 1 year after the
date of issuance of the guidelines under
subsection (a);

        (B) establish administrative mechanisms
allowing affected persons to seek and obtain
correction of information maintained and
disseminated by the agency that does not
comply with the guidelines issued under
subsection (a); and

        (C) report periodically to the Director--

            (i) the number and nature of complaints
received by the agency regarding the
accuracy of information disseminated by
the agency; and

            (ii) how such complaints were handled by
the agency.

44 U.S.C. § 3516, note.

     Title 44 U.S.C. § 3504(d)(1), in turn, provides, "With

respect to information dissemination, the Director [of the OMB]

shall develop and oversee the implementation of policies,

principles, standards, and guidelines to . . . apply to Federal agency dissemination of public information, regardless of the form or format in which such information is disseminated."

B. OMB Guidelines

On June 28, 2001, the OMB issued proposed guidelines implementing the IQA and requesting public comment.  66 Fed. Reg. 34489.

On September 28, 2001, the OMB issued final guidelines implementing the IQA.  66 Fed. Reg. 49718.  At that time, the OMB requested additional comments on a provision not relevant to the case at hand and, after receiving further comments, issued updated final guidelines on February 22, 2002.  See 67 Fed. Reg. 8452 (hereinafter, the OMB guidelines).

The OMB guidelines require agencies to "adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal," including "specific standards of quality that are appropriate for the various categories of information they disseminate."  67 Fed. Reg. 8458-59.  "Quality is to be ensured and established at levels appropriate to the nature and timeliness of the information to be disseminated."  Id. at 8458.  "'Objectivity' includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner."  Id. at 8460.  The guidelines also require agencies to "develop a process to review the quality . . . of information before it is disseminated," and "administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines."

United States District Court
For the Northern District of California

_Id._ at 8459.  Finally, agencies are required to prepare reports providing the agency's information quality guidelines and information regarding the number and nature of the complaints received by the agency and how they were resolved.  _Id._

By their terms, the OMB guidelines apply to "information" that is "disseminated by Federal agencies."  _Id._ at 8458.  The guidelines define information to mean "any communication or representation of knowledge such as facts or data, in any medium or form," including "information that an agency disseminates from a web page," but not "opinions, where the agency's presentation makes it clear that what is being offered is someone's opinion rather than fact or the agency's views."  _Id._ at 8460.  The guidelines define dissemination as "agency initiated or sponsored distribution of information to the public," but states that this definition "does not include distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes."  _Id._

The guidelines direct that the administrative correction process "shall be flexible" and "appropriate to the nature and timeliness of the disseminated information."  _Id._ at 8459.  The OMB commentary provided when the guidelines were published states that it "does not envision administrative mechanisms that would burden agencies with frivolous claims," and that "[a]gencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and

4

timeliness of the information involved." Id. at 8458.  It notes

that "an objective process will ensure that the office that

originally disseminates the information does not have

responsibility for both the initial response and resolution of a

disagreement." Id.

    C. DOJ Guidelines

    On May 14, 2002, DOJ published notice in the Federal Register

that its draft guidelines had been posted to its public web site

and requested public comments.  67 Fed. Reg. 34475.  On October 4,

2002, DOJ published notice in the Federal Register that its final

guidelines were available on its public website.  67 Fed. Reg.

6266.  The final guidelines are currently available at

http://www.justice.gov/iqpr/iqpr.html.  See also Pl.'s Ex. E

(hereinafter, the DOJ guidelines).

    The introduction to the DOJ guidelines notes that the DOJ

produces "a variety of information which is provided to the

public," including "Departmental briefs in major cases,

regulations, business review letters, memoranda, press releases,

opinions, research, statistical and special reports, newsletters,

and general publications," although "[n]ot all of this information

falls within these guidelines."  DOJ guidelines.  The DOJ

guidelines focus on three areas: (1) the basic standard of

quality, including objectivity, utility and integrity; (2) the

process for reviewing the quality of information; and (3) the

process for citizen complaint.  Id.  As to objectivity, the

guidelines state that "DOJ components will ensure disseminated

information, as a matter of substance and presentation, is

accurate, reliable, and unbiased."  Id.  As to objectivity, the

guidelines provide that "DOJ components will ensure disseminated information, as a matter of substance and presentation, is accurate, reliable, and unbiased."  Id.

The guidelines provide that "DOJ will correct information that does not meet its guidelines or those of OMB based on the significance and impact of the correction."  Id.  They further state, "Except for those categories of information that are specifically exempt from coverage . . ., these guidelines apply to all information disseminated by DOJ," including "information that an agency disseminates from a web page."  Id.  The stated exceptions include "information disseminated in the following contexts: . . . press releases, fact sheets, press conferences or similar communications (in any medium) that announce, support or give public notice of information in DOJ."  Id.

As required by the IQA and OMB guidelines, the DOJ guidelines set forth procedures for submitting requests for correction of DOJ information.  Under the guidelines, "DOJ will normally respond to requests for correction of information within 60 calendar days of receipt."  Id.  The guidelines provide that "DOJ is not required to change, or in any way alter, the content or status of information simply based on the receipt of a request for correction," and that "[a]ny corrective action will be determined by the nature and timeliness of the information involved and such factors as the significance of the error on the use of the information and the magnitude of the error."  Id.  Further, under the guidelines, DOJ "need not respond substantively to frivolous or repetitive requests for correction," or "to requests that

United States District Court
For the Northern District of California

concern information not covered by the guidelines or from a person whom the information does not affect." Id.

"If the requestor disagrees with DOJ's denial of the request or with the corrective action the Department intends to take, the requestor may file a request for reconsideration with the disseminating DOJ component" within forty-five days of DOJ's decision on the original request for correction. Id. DOJ "should generally provide that the official conducting the second level review is not the same official that responded to the initial request." Id. "DOJ will respond to all requests for reconsideration within 45 calendar days of receipt." Id.

The DOJ guidelines also specify, "These guidelines are not a regulation. They are not legally enforceable and do not create any legal rights or impose any legally binding requirements or obligations on the agency or the public. Nothing in these guidelines affects any otherwise available judicial review of agency action." Id.

II. The Underlying Criminal Case

In March 2008, Plaintiff was indicted for wire fraud in violation of 18 U.S.C. § 1343 and felony misbranding of a drug in violation of 21 U.S.C. §§ 331(k), 333(a)(2) and 352(a). Docket No. 1, United States v. Harkonen, Case No. 08-CR-164 (N.D. Cal.) (Patel, J.).[1]

---

[1] The Court takes judicial notice of the allegations made in the indictment but not the truth of these allegations. The Court provides these allegations as context to understand the factual background presented by the parties, particularly by Plaintiff, but notes that these allegations were not relevant to the determination of the instant motions.

In relevant part, the indictment made the following allegations: Plaintiff was the Chief Executive Officer of InterMune, Inc. from February 1998 through at least June 30, 2003 and was a member of its Board of Directors from February 1998 through September 2003.  InterMune developed, marketed and sold drugs, including a drug sold under the brand name Actimmune. Actimmune was approved by the FDA to treat two rare disorders that primarily affect children, chronic granulomatous disease and severe, malignant osteopetrosis.  It was not approved by the FDA to treat idiopathic pulmonary fibrosis (IPF), a fatal lung disease that mainly affects middle-aged people.

In October 2000, InterMune began a Phase III clinical trial, named the GIPF-001 trial, to determine whether treating IPF patients with Actimmune was effective.

In August 2002, data from that clinical trial failed to show that Actimmune was effective in treating IPF.  Plaintiff discussed the results of the trial with his staff at InterMune and directed them to conduct additional analyses on subgroups of patients. This after-the-fact analysis suggested a survival trend for patients whose IPF was described by InterMune as "mild to moderate."

On August 27, 2002, Plaintiff and some InterMune employees spoke with the FDA about the results of the GIPF-001 Phase III trial and additional subgroup analyses of patient deaths.  The FDA medical reviewer staff advised Plaintiff that the trial data were not sufficient to gain FDA approval for Actimmune to treat IPF and that further clinical testing would be required to determine whether Actimmune could delay death for IPF patients.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

On August 28, 2002, InterMune issued a nationwide press release publicly announcing the results of the GIPF-001 Phase III clinical trial. Plaintiff wrote the headline and subheading and controlled the content of the entire press release. Plaintiff caused the press release to be posted on InterMune's website and to be sent to a wire service for release to news outlets nationwide. The headline stated, "InterMune Announces Phase III Data Demonstrating Survival Benefit of Actimmune in IPF," with the subheading "Reduces Mortality by 70% in Patients With Mild to Moderate Disease."

This press release, which is attached to Plaintiff's complaint in the instant case and was offered by him as evidence in support of his motion for summary judgment, also stated:

> InterMune, Inc. (Nasdaq: ITMN) announced today that preliminary data from its Phase III clinical trial of Actimmune® (Interferon gamma-1b) injection for the treatment of idiopathic pulmonary fibrosis (IPF), a debilitating and usually fatal disease for which there are no effective treatment options, demonstrate a significant survival benefit in patients with mild to moderate disease randomly assigned to Actimmune versus control treatment (p = 0.004). . . .
>
> Importantly, Actimmune also demonstrated a strong positive trend in increased survival in the overall patient population, and a statistically significant survival benefit in patients with mild to moderate IPF. . . .

Haddad Decl. ¶ 3, Compl., Ex. 2.

The wire fraud count alleged that the press release "contained materially false and misleading information regarding Actimmune and falsely portrayed the results of a GIPF-001 Phase III trial as establishing that Actimmune reduces mortality in patients with IPF."

United States District Court
For the Northern District of California

At a pretrial conference in the criminal case, the prosecutor acknowledged that the allegations in the indictment were not that the data in the study were "transposed or changed in any way," but rather challenged the interpretation and presentation of the data. See Haddad Decl. ¶ 4, Compl., Ex. 3G, 28.

During closing arguments, when discussing the press release, the prosecutor stated, "I don't need to spend any time on the numbers in there. We all know the numbers are correct." Id. at 3698:20-21.

On September 29, 2009, the jury convicted Plaintiff of wire fraud and acquitted him of felony misbranding. Docket No. 240, United States v. Harkonen, No. 08-CR-164.

On November 17, 2010, at the first sentencing hearing, the prosecutor stated, "The Government has always agreed that there was no falsification of data here, so that fact is not in dispute, and there's no need to have anyone testify on that. With respect to whether there was a falsification of the conclusions that could be drawn from the data, that was what the trial was all about. That was the central issue in the trial . . ." Haddad Decl. ¶ 8, Compl., Ex. 7; see also Docket No. 301, 9:1-8, United States v. Harkonen, No. 08-CR-164.

Similar statements were made at the second sentencing hearing on April 13, 2011. The court stated that "there's no dispute, is there, that the data that's actually referred to in the press release is accurately reflected? Is that correct?" Haddad Decl. ¶ 9, Compl., Ex. 8; Docket No. 373, 12:1-3, United States v. Harkonen, No. 08-CR-164. The prosecutor responded, "No dispute. The government says the conclusions were inaccurate" and "were

false." Id. at 12:4-8.  The court replied, "It's the
interpretation thereof, et cetera.  Is that correct?  Okay." Id.
at 12:9-10.

At the April 13, 2011 hearing, Judge Patel declined to impose
a sentence enhancement based on proof that an actual loss had been
suffered by victims, stating:

> The Court finds . . . that whichever burden of proof the
> Court would use, that it is unable to determine with a
> sufficient degree of accuracy that . . . there is a loss
> as a result of the conduct reflected in the wire fraud
> count . . . there just isn't enough evidence in the
> record under either burden of proof to satisfy the Court
> that there is a loss as a result of the press release.

Id. at 116:14-25.

Plaintiff's appeal from the criminal conviction and the
government's cross-appeal of his sentence are currently pending
before the Ninth Circuit.  See United States v. Harkonen, Case
Nos. 11-10209 & 11-10242 (9th Cir.).

III. The DOJ Press Release and Requests for Correction

On September 29, 2009, the same day that the jury returned
the verdict in the criminal trial, the United States Attorney's
Office in this district issued a press release announcing the
verdict.  Haddad Decl. ¶ 2, Compl., Ex. 1.  At issue in this case
are the following two paragraphs of the press release, and
particularly the underlined sections:

> "Mr. Harkonen lied to the public about the results of a
> clinical trial and offered false hope to people stricken
> with a deadly disease.  Manipulating scientific research
> and falsifying test results damages the foundation of
> the clinical trial process and undermines public trust
> in our system for drug approval," said FBI Special Agent
> in Charge Stephanie Douglas.
>
> Douglas J. Carver, Special Agent in Charge of the U.S.
> Department of Veterans Affairs, Office of Inspector
> General, Western Field Office, stated "today's verdict,

11

> which resulted from a complex and labor-intensive
> investigation and trial, demonstrates our commitment to
> work with our law enforcement partners to aggressively
> pursue all individuals that would jeopardize the
> integrity and safety of the VA's health care system.
> <u>The actions of this defendant served to divert precious
> financial resources from the VA's critical mission of
> providing healthcare to this nation's military veterans.</u>
> . . ."

<u>Id.</u> at 2 (emphasis added).

On February 11, 2010, Plaintiff submitted his first request for correction of the press release to the United States Attorney's Office, under the DOJ guidelines. Haddad Decl. ¶ 4, Compl., Ex. 3. Plaintiff requested that the government correct its description of the charges against him, and stated, "The Government's assertion in the DOJ press release that Dr. Harkonen 'falsif[ied] test results' thus misrepresents what the Government sought to prove in the case and misleads the public as to what the jury actually found, and as to why Dr. Harkonen was convicted." <u>Id.</u> at 1-3.

On March 15, 2010, H. Marshall Jarrett, Director of the DOJ's Executive Office for United States Attorneys sent Plaintiff a letter denying his request on two bases. Haddad Decl. ¶ 5, Compl., Ex. 4. First, he stated that, because the complained-of statement was disseminated in a press release, it was not covered by the OMB or DOJ guidelines, which expressly exclude press releases from their coverage. <u>Id.</u> at 1. Second, he asserted, "Even if the guidelines applied, no retraction is necessary because the statement at issue is correct." <u>Id.</u> He explained,

> While we agree that Mr. Harkonen did not change the
> data, he nevertheless used it to support his false and
> misleading conclusions. Because data alone is
> meaningless without analysis and conclusions, Mr.
> Harkonen's false statements regarding the data's meaning

were part and parcel of the results.  Thus, it was accurate to say that he falsified the results.

Id. at 2.

On April 20, 2010, Plaintiff submitted a request for reconsideration.  Haddad Decl. ¶ 6, Compl., Ex. 5.  In the request, he argued that the DOJ guidelines did apply to the press release, because it was posted on a web page and because it did not "announce, support or give public notice of information in DOJ," but rather "announced the verdict of a criminal trial in federal court."  Id. at 2-3.  He further contended that, when an agency's "guidelines address an issue that is treated only more generally in the OMB guidelines, the agency's own, more specific guidelines control," and thus that the OMB guidelines could not be used to limit coverage under the DOJ guidelines.  Id. at 3.  He also argued that the press release did fall within the OMB guidelines, in part because a 2003 U.S. Attorneys' Manual stated, "The use of a press release . . . is the usual method to release public information to the media by Department of Justice components and investigative agencies."  Id. at 3-4.  Finally, he maintained that the DOJ's defense of the merits of the statement was "nonsensical" and "ignores the well-recognized distinction between scientific data and scientific analysis."  Id. at 4-5 (emphasis in original).

On July 2, 2010, Jarrett responded, rejecting Plaintiff's request for reconsideration.  Haddad Decl. ¶ 7, Compl., Ex. 6.  He stated that "a press release that announces a successful prosecution is clearly public information in the Department of Justice," and thus that the press release falls within the exception.  Id. at 1.  He also stated that the "guidelines make no

distinction between a press release that is posted on the Internet and one that is issued any other way (<u>e.g.</u>, fax or mail)," and that "the very fact that the information is contained in a press release . . . exempts it from the guidelines." <u>Id.</u> He did not address directly Plaintiff's argument on the merits of the statement, but noted, "Because the guidelines do not apply to press releases, the Department was not required to respond substantively to your initial request for a retraction." <u>Id.</u>

On June 8, 2011, Plaintiff submitted to the United States Attorney's Office his second request for correction of the press release. Haddad Decl. ¶ 10, Compl., Ex. 9. In this request, he argued that the statement in the press release that his actions "served to divert precious financial resources from the VA's critical mission of providing healthcare to this nation's military veterans" was inaccurate and violated the DOJ and OMB guidelines, because the government had been unable to prove during the sentencing phase of his criminal case that the Actimmune press release had caused a loss to any victim, including to the VA. <u>Id.</u> at 1-3. He also repeated many of his earlier arguments regarding the applicability of the DOJ and OMB guidelines to press releases.

On August 4, 2011, Jarrett rejected Plaintiff's second request for two reasons. Haddad Decl. ¶ 11, Compl., Ex. 10. He again stated that the press release was not covered by either the OMB or DOJ guidelines. <u>Id.</u> at 1-2. He also asserted, "Even if the guidelines applied, no retraction is necessary because the statement accurately described the government's position." <u>Id.</u> at 2. He explained,

As you know, the government has consistently maintained that Dr. Harkonen's false and misleading press release fraudulently caused patients to seek and doctors to prescribe Actimmune as a treatment for idiopathic pulmonary fibrosis, thereby leading to increased sales of Actimmune.  Although the district court found that the government did not meet its burden of proving actual loss for purposes of Dr. Harkonen's sentencing, this does not mean the press release did not have any effect on Actimmune's sales.  The district court simply held that it was not possible to determine with the degree of certainty necessary for Dr. Harkonen's sentencing, the role the press release played in the increased sales of Actimmune that followed after the press release over eight years ago.

Moreover, the statement that Dr. Harkonen's actions "served to divert precious financial resources from the VA's critical mission of providing health care to this nation's military veterans" can reasonably be interpreted to mean that Dr. Harkonen's wrongdoing necessitated an investigation into the matter by the Veterans Administration.  As the investigation into this matter was comprehensive, it was accurate to say that it diverted precious financial resources from the VA's primary mission.

Id. at 2.

On August 22, 2011, Plaintiff submitted a request for reconsideration of the August 4 decision.  Haddad Decl. ¶ 11, Compl., Ex. 10.  Plaintiff asked that his request be reviewed by someone other than Jarrett.  Plaintiff argued again that the press release was covered by the OMB and DOJ guidelines, that this statement did not concern "information in DOJ" and that the government was unable to provide any evidence in support of the assertion that the VA had lost money that would have been devoted to health care for veterans.  Id. at 1-5.  He further contended that the argument that the VA investigation used financial resources that could otherwise have been devoted to the VA's central mission of health care for veterans was incorrect.  Id. at 6.  He argued that "a reasonable reader would assume that the VA chose to allocate funds that already were designated for the

investigation of potential health care fraud to the investigation of this case" because the VA's Office of Inspector General "is 'independent' from the VA and is considered 'a separate Federal agency with annual budgetary submission requirements.'" Id. (quoting VA 2010 Organizational Briefing Book 42).

On October 7, 2011, Jarrett sent a response, stating that the second request for reconsideration would "not be accommodated." Haddad Decl. ¶ 13, Compl., Ex. 12, 1.  He explained,

> As we have previously explained, the Guidelines do not apply to press releases.  Moreover, because the Guidelines do not apply to press releases, the Department was not required to respond substantively to your June 8, 2011 request for a retraction and, similarly, is not required to respond substantively to your most recent request for reconsideration.  The Guidelines provide that "[t]he Department need not respond substantively . . . to repetitive requests for correction . . . [nor to] requests that concern information not covered by the guidelines.

Id.

On February 8, 2012, Plaintiff initiated the instant case against DOJ and the OMB under the IQA and the Administrative Procedure Act (APA), 5 U.S.C. § 701, et seq.  Docket No. 1.  In the first count, asserted against DOJ only, Plaintiff asserts that DOJ's denial of his first and second requests for correction was arbitrary and capricious, an abuse of discretion and contrary to law.  In the second count, also asserted against DOJ only, Plaintiff asserts that the exclusion of press releases from the DOJ guidelines is arbitrary and capricious, an abuse of discretion, and contrary to law.  In the third count, asserted against the OMB only, Plaintiff asserts that the exclusion of press releases from the OMB guidelines is arbitrary and capricious, an abuse of discretion, and contrary to law.

United States District Court
For the Northern District of California

1     On April 9, 2012, the government filed this motion to

2  dismiss.  Docket No. 8.

3     On July 2, 2012, Plaintiff filed his cross-motion for summary

4  judgment and opposition to the government's motion to dismiss.

5  Docket No. 21.

6                          DISCUSSION

7  I.  Defendants' Motion to Dismiss

8     Defendants argue that Plaintiff's complaint should be

9  dismissed because there is no private right of action under the

10 IQA and his claims are not subject to judicial review under the

11 APA.  Plaintiff responds that he has not asserted a private right

12 of action under the IQA and seeks review under the APA only.  He

13 contends that the APA does provide for judicial review of the

14 DOJ's denial of his requests for correction.

15    A. Legal Standard

16    A complaint must contain a "short and plain statement of the

17 claim showing that the pleader is entitled to relief."  Fed. R.

18 Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to

19 state a claim, dismissal is appropriate only when the complaint

20 does not give the defendant fair notice of a legally cognizable

21 claim and the grounds on which it rests.  Bell Atl. Corp. v.

22 Twombly, 550 U.S. 544, 555 (2007).  In considering whether the

23 complaint is sufficient to state a claim, the court will take all

24 material allegations as true and construe them in the light most

25 favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d

26 896, 898 (9th Cir. 1986).  However, this principle is inapplicable

27 to legal conclusions; "threadbare recitals of the elements of a

28 cause of action, supported by mere conclusory statements," are not

United States District Court
For the Northern District of California

17

taken as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(citing Twombly, 550 U.S. at 555).

When granting a motion to dismiss, the court is generally

required to grant the plaintiff leave to amend, even if no request

to amend the pleading was made, unless amendment would be futile.

Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911

F.2d 242, 246-47 (9th Cir. 1990).  In determining whether

amendment would be futile, the court examines whether the

complaint could be amended to cure the defect requiring dismissal

"without contradicting any of the allegations of [the] original

complaint."  Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th

Cir. 1990).

Although the court is generally confined to consideration of

the allegations in the pleadings, when the complaint is

accompanied by attached documents, such documents are deemed part

of the complaint and may be considered in evaluating the merits of

a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d

1265, 1267 (9th Cir. 1987).

B. Final Agency Action

The APA provides judicial review for "final agency action for

which there is no other adequate remedy in a court."  5 U.S.C.

§ 704.  "[T]wo conditions must be satisfied for agency action to

be 'final': First, the action must mark the 'consummation' of the

agency's decisionmaking process, . . .  And second, the action

must be one by which 'rights or obligations have been determined,'

or from which 'legal consequences will flow.'"  Bennett v. Spear,

520 U.S. 154, 177-78 (1997) (internal citations omitted).  "As the

Supreme Court has stated, '[t]he core question is whether the

United States District Court
For the Northern District of California

agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" Indus. Customers of Nw. Utilities v. Bonneville Power Admin., 408 F.3d 638, 646 (9th Cir. 2005) (quoting Franklin v. Massachusetts, 505 U.S. 788, 797 (1992)). Defendants do not dispute that the first requirement is met. Instead, their dispute centers on the second requirement.

Defendants argue that the IQA does not create any right to correct information and thus that there was no right affected by, and no legal consequence to, the denial of Plaintiff's requests for correction. Plaintiff responds that the text of the statute confers legal rights on persons who are affected by an agency's dissemination of incorrect information and that the denial of his requests for correction interferes with these rights.

"The general rule is that administrative orders are not final and reviewable 'unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.'" Ukiah Valley Med. Ctr. v. FTC, 911 F.2d 261, 264 (9th Cir. 1990) (quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948)). "When an action is not a 'definitive' statement of the" agency's "position and does not have a 'direct and immediate . . . effect on the day-to-day business' of the subject party, it is not 'final.'" Id. (quoting FTC v. Standard Oil Co., 449 U.S. 232, 239 (1980)). "Other relevant factors include whether the order has the status of law or comparable legal force, and whether immediate compliance with its terms is expected." Id.

Courts that have reviewed the IQA have uniformly found that it "does not create any legal right to information or its correctness." Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006); see also Habitat for Horses v. Salazar, 2011 WL 4343306, at *7 (S.D.N.Y.); Single Stick, Inc. v. Johanns, 601 F. Supp. 2d 307, 317 (D.D.C. 2009), rev'd in part on other grounds sub nom. Prime Time Int'l Co. v. Vilsack, 599 F.3d 678 (D.C. Cir. 2010); Wood ex rel. U.S. v. Applied Research Associates, Inc., 2008 WL 2566728, at *6 (S.D.N.Y.); Haas v. Gutierrez, 2008 U.S. Dist. LEXIS 48762, at *25 (S.D.N.Y.); Ams. for Safe Access v. U.S. Dept. of Health & Human Services, 2007 WL 2141289, at *4 (N.D. Cal.), aff'd on other grounds, 399 F. App'x 314 (9th Cir. 2010). Several district courts have held that, as a result, the agencies' actions did not determine the plaintiff's rights or cause any legal consequence, and thus that there was no final agency action. Single Stick, 601 F. Supp. 2d at 317 ("Because the IQA does not vest any party with a right to information or to correction of information, . . . the USDA's actions under the IQA did not determine Single Stick's rights or cause any legal consequence."); Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 602 (E.D. Va. 2004) ("Agency dissemination of advisory information that has no legal impact has consistently been found inadequate to constitute final agency action and thus is unreviewable by federal courts under the APA."), aff'd on alternate grounds sub nom., Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006); see also Ams. for Safe Access, 2007 WL 2141289, at *4 (rejecting plaintiff's argument that "the legal consequence of HHS's final decision denying ASA's [p]etition and appeal is that ASA has been deprived of its right under the IQA to seek and

obtain the timely correction of incorrect information" because plaintiff "failed to plead that the IQA grants any legal right to the correction of information").[2]

Plaintiff offers no cases in which a court has held to the contrary. Instead, Plaintiff seeks to diminish the importance of the district court cases by pointing out that, on appeal, the appellate courts did not directly address this issue and affirmed the decisions on other grounds. For example, in Americans for Safe Access, the district court granted the plaintiff leave to amend to "proceed on a theory that defendants unlawfully withheld or delayed agency action by not giving a substantive response to plaintiff's petition." 2007 WL 2141289, at *5. After the plaintiff amended its complaint and the defendants moved again for dismissal, the district court dismissed the case, finding that the IQA and OMB guidelines did not create a duty for agencies to perform actions that are legally required. Ams. for Safe Access v. U.S. Dept. of Health & Human Services, 2007 WL 4168511, at *1-4 (N.D. Cal.). On appeal, the Ninth Circuit affirmed the district court's dismissal of the action on the basis that the agency had made only an "interlocutory decision" on the IQA petition at issue and deferred its final decision; thus, there had been no

_____

[2] On December 2, 2011, the House of Representatives passed H.R. 3010, which would, among other things, amend 5 U.S.C. § 704 of the APA to specify, "Denial by an agency of a correction request or, where administrative appeal is provided for, denial of an appeal, under an administrative mechanism described in subsection (b)(2)(B) of the Information Quality Act, or the failure of an agency within 90 days to grant or deny such request or appeal, shall be final action for purposes of this section." On December 5, 2011, the Senate referred the bill to the Committee on Homeland Security and Governmental Affairs; since then, no further action has been taken. 2011 H.R. 3010.

United States District Court
For the Northern District of California

"consummation of the agency's decision making process," as
required by the first <u>Bennett</u> criterion.   <u>Ams. for Safe Access v.
Dept. of Health & Human Services</u>, 399 F. App'x 314, 315-16 (9th
Cir. 2010) (internal quotation marks omitted).   The court did not
reach the second <u>Bennett</u> criterion and thus did not address
whether the action was one by which rights or obligations were
determined or from which legal consequences flowed.   In <u>Prime
Time</u>, the D.C. Circuit upheld the OMB's decision to exclude
documents prepared and distributed in the context of adjudicative
proceedings as a reasonable interpretation of the IQA, worthy of
deference.   599 F.3d at 685-86.   In neither decision did the
appellate court directly question the district court's holding
that the agency action did not determine the plaintiff's rights or
cause any legal consequence.

Plaintiff suggests that, because the D.C. Circuit reached the
merits of the IQA claim in <u>Prime Time</u>--the only case to do so--a
contrary finding was implicit, because the court had to find first
that it had jurisdiction under the APA to review the merits of the
IQA claim before it could proceed to do so.   However, "the appeals
court specifically concluded the underlying agency action--USDA's
determination of manufacturer's assessments under the Fair and
Equitable Tobacco Reform Act ('FETRA')--was an adjudicatory
proceeding subject to judicial review directly under FETRA" and
thus there was no need to, and the appellate court did not,
consider whether judicial review was also available under the APA.
<u>Family Farm Alliance v. Salazar</u>, 749 F. Supp. 2d 1083, 1096-1100
(E.D. Cal. 2010); <u>see</u> <u>Prime Time</u>, 599 F.3d at 686 ("USDA's
determination of Prime Time's assessments for three quarters of FY

**United States District Court**
For the Northern District of California

2005 was an adjudication, attendant to which Prime Time had rights to an administrative appeal and judicial review" under 7 U.S.C. § 518d(i), (j)).  Thus, <u>Prime Time</u> does not support that, by reaching the substantive question, the court found there was a right to review under the APA.

Plaintiff also tries to distinguish <u>Salt Institute</u> because the plaintiffs in that case sought the release of information, not correction of it, and the appellate court held that the plaintiffs lacked standing, instead of addressing the APA requirements. Pl.'s Cross-Mot. for Summ. J. and Opp. to Defs.' Mot. to Dismiss (Pl.'s Cross-Mot.), 15.  However, the appellate decision is not so limited; in it, the court discussed the IQA in detail and broadly stated that "this statute creates no legal rights in any third parties" and "does not create any legal right to information or its correctness."  <u>Salt Inst. v. Leavitt</u>, 440 F.3d at 158-59.

Further, this result is concordant with the IQA.  The IQA does not, as Plaintiff contends, state that the guidelines "'shall' give 'affected persons' such as Dr. Harkonen an opportunity 'to seek and obtain correction of information maintaining and disseminated by the agency . . .'"  Pl.'s Cross-Mot. at 13.  Instead, the IQA requires that the OMB draft guidelines about information quality within a certain time frame and sets forth particular requirements about the content of those guidelines, including that the guidelines address the establishment of administrative mechanisms for requests for correction.  It does not provide that individuals have a right to correct information.  Thus, the denial of Plaintiff's request for correction did not deny him a legal right.

1  Plaintiff also contends that DOJ's denials of his requests

2  for correction "have the 'legal consequence' that [he] did not

3  obtain the press release corrections that he sought under the DOJ

4  Guidelines." Pl.'s Cross-Mot. at 13. Although this may have the

5  practical consequence that Plaintiff has not obtained what he

6  wanted, it does not have any <u>legal</u> consequence for him. For

7  example, DOJ's denial has no direct or immediate effect on his

8  day-to-day activities, nor is he required to take any action

9  because of it.

10  Plaintiff cites several cases that he states establish, "When

11  a statute gives a person the right to request an agency to take an

12  action, the agency's decision not to take the requested action is

13  'final agency action,' regardless of whether the agency had

14  discretion to deny the request." <u>Id.</u> at 14. However, the statute

15  here does not give Plaintiff the right to request that DOJ correct

16  information nor the right to obtain a correction; instead, it

17  requires the OMB to promulgate guidelines by which agencies must

18  create procedures for such requests.

19  Further, the cases that Plaintiff cites on this point are

20  inapposite. Plaintiff states that he cites <u>Fox TV Stations, Inc.</u>

21  <u>v. FCC</u>, 280 F.3d 1027, 1037 (D.C. Cir. 2002), for the "general

22  proposition" that "'an agency's denial of a petition to initiate a

23  rulemaking for the repeal or modification of a rule is a final

24  agency action subject to judicial review.'" Pl.'s Reply, 7.

25  However, the present case does not deal with Defendants' refusal

26  to embark on formal rulemaking; instead, Plaintiff seeks to

27  address DOJ's refusal to change a press release. In <u>Intercity</u>

28  <u>Transp. Co. v. United States</u>, 737 F.2d 103 (D.C. Cir. 1984), the

**United States District Court**
For the Northern District of California

1   Interstate Commerce Commission refused to institute a declaratory

2   order proceeding, which the D.C. Circuit found had legal

3   consequence because it "had the potential of infringing upon

4   petitioners' statutory right to a reasoned agency disposition of

5   its request," as provided under a separate section of the APA, 5

6   U.S.C. § 554(e), which is inapplicable here.  Here, there is no

7   separate legal right that Defendants' refusal has infringed, as

8   discussed above.  Finally, the cases that Plaintiff offers

9   regarding the statute under which members of the Armed Forces can

10  seek correction of their records are inapplicable.  In his cross-

11  motion, Plaintiff cites Barber v. Widnall, 78 F.3d 1419 (9th Cir.

12  1996), but this decision does not address final agency action or

13  whether an action is reviewable under the APA.  In his reply,

14  Plaintiff cites Clinton v. Goldsmith, 526 U.S. 529 (1999); in

15  Clinton, the Court collects cases to support the proposition that

16  a servicemember can challenge an agency's decision to drop him

17  from the rolls, or otherwise dismiss him, as final agency action.

18  Id. at 539.  Plaintiff argues that these are "clearly parallel" to

19  the case at hand but fails to explain why.  "When a servicemember

20  is dropped from the rolls, he forfeits his military pay."  Id. at

21  532 n.1.  This, unlike the denial in the case at hand, affects

22  legal rights.

23      Accordingly, the Court holds that there has been no final

24  agency action in the case at hand.

25      C. Committed to Agency Discretion by Law

26      Under 5 U.S.C. § 701(a)(2), judicial review is foreclosed

27  when the challenged "agency action is committed to agency

28  discretion by law."  One instance in which agency action is exempt

from judicial review under this provision is when "'a court would have no meaningful standard against which to judge the agency's exercise of discretion' and there thus 'is no law to apply.'" Newman v. Apfel, 223 F.3d 937, 943 (9th Cir. 2000) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).  The Supreme Court has emphasized that this "is a very narrow exception" and "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (internal quotation marks and citations omitted), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977).

Defendants contend that both agencies' decisions to exclude press releases from their IQA guidelines and DOJ's decision not to issue a correction were committed to their discretion by law.

"In determining whether judicial review is precluded on § 701(a)(2) grounds," the Ninth Circuit considers "'the language of the statute and whether the general purposes of the statute would be endangered by judicial review.'"  Pinnacle Armor, Inc. v. United States, 648 F.3d 708, 719 (9th Cir. 2011) (quoting Cnty. of Esmeralda v. Dep't of Energy, 925 F.2d 1216, 1218 (9th Cir. 1991)).  "Therefore, 'the mere fact that a statute contains discretionary language does not make agency action unreviewable.'" Id. (quoting Beno v. Shalala, 30 F.3d 1057, 1066 (9th Cir. 1994)). In addition to the relevant statute, courts also look to "regulations, established agency policies, or judicial decisions" for a meaningful standard against which to review the agency's exercise of discretion.  Id. (citing Mendez-Gutierrez v. Ashcroft,

United States District Court
For the Northern District of California

340 F.3d 865, 868 (9th Cir. 2003)); <u>see also</u> <u>Padula v. Webster</u>,
822 F.2d 97, 100 (9th Cir. 1987) ("Judicially manageable standards
may be found in formal and informal policy statements and
regulations as well as in statutes, but if a court examines all
these possible sources and concludes that there is, in fact, no
law to apply, judicial review will be precluded.") (internal
quotation marks and citations omitted).

Several courts have considered whether the judicial review of
various agency decisions under the IQA is prohibited on
§ 701(a)(2) grounds.  In <u>In re Operation of the Missouri River
System Litigation</u>, 363 F. Supp. 2d 1145, 1174 (D. Minn. 2004), the
plaintiffs challenged the defendants' failure to comply with their
request for "information and science" regarding proposed flow
plans for the Missouri River.  The court found that there was no
meaningful standard against which to evaluate the agency's
decision to deny the information quality request.  It reached this
conclusion because, "[a]lthough the IQA directs the [OMB] to issue
guidelines that provide policy and procedural guidance to Federal
agencies for ensuring and maximizing the quality, objectivity,
utility, and integrity of information disseminated by the agency,
the plain language of the legislation fails to define these
terms," and "the history of the legislation fails to provide any
indication as to the scope of these terms."  <u>Id.</u> at 1174-75.

In <u>Salt Institute</u>, the plaintiffs challenged the National
Heart, Lung and Blood Institute (NHLBI)'s denial of their request
for disclosure of all data and methods connected with a clinical
trial.  The district court held that judicial review of the
NHLBI's decisions was not available under the APA "because the IQA

United States District Court
For the Northern District of California

and OMB guidelines at issue insulate the agency's determinations of when correction of information contained in informal agency statements is warranted."  345 F. Supp. 2d at 602-03.  In so holding, it stated,

> Neither the IQA nor the OMB Guidelines provide judicially manageable standards that would allow meaningful judicial review to determine whether an agency properly exercised its discretion in deciding a request to correct a prior communication.  In fact, the guidelines provide that "agencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved."  67 Fed. Reg. at 8458.  Courts have determined that regulations containing similar language granted sufficient discretion to agencies to preclude judicial review under the APA.

Id.

In Family Farm Alliance, a court of the Eastern District of California considered whether the IQA and its implementing guidelines committed to agency discretion the agency actions that the plaintiff challenged, which were the timing of the Fish and Wildlife Service (FWS)'s responses to requests for correction and appeals and the makeup of peer review panels.  Before going on to address the agency's regulations in relation to each of these, the court noted that "the IQA itself contains absolutely no substantive standards, let alone any standards relevant to the claims brought in this case . . . ."  Id. at 1092.  The court then also concluded that the OMB and FWS guidelines did preserve the agency's discretion regarding these matters.  Id. at 1093-1100.

Here, in his second and third claims, Plaintiff challenges the decisions of the OMB and DOJ to exempt from their guidelines information disseminated in a press release.  The IQA mandates

**United States District Court**
For the Northern District of California

1  that the OMB "issue guidelines . . . that provide policy and

2  procedural guidance to Federal agencies for ensuring and

3  maximizing the quality, objectivity, utility, and integrity of

4  information . . . disseminated by Federal agencies." 44 U.S.C.

5  § 3516, note. It further requires that the OMB's guidelines

6  provide that the agencies also shall "issue guidelines ensuring

7  and maximizing the quality, objectivity, utility, and integrity of

8  information . . . disseminated by the agency." Id. However, as

9  the District of Minnesota held in Missouri River, the plain

10 language of the IQA does not define these terms, and its history

11 does not provide any indication as to their scope. The IQA's

12 terms in fact direct the OMB itself to establish policy to guide

13 the agencies.

14      Plaintiff argues that the direction that the OMB's

15 regulations provide guidance to agencies to maximize the quality,

16 objectivity, utility, and integrity of information disseminated is

17 a sufficiently meaningful standard by which to review the contents

18 of the regulations of the OMB and DOJ. He points to cases in

19 which the Ninth Circuit has found that regulations and statutes

20 are sufficiently meaningful for review and argues that the

21 standards in the IQA have more content than the ones addressed in

22 those cases.

23      However, Plaintiff is incorrect; the statute and regulations

24 examined in those cases provide significantly more meaningful

25 standards for review than the IQA does. In Socop-Gonzalez v. INS,

26 208 F.3d 838 (9th Cir. 2000), the Ninth Circuit found that the

27 Board of Immigration Appeal (BIA)'s regulations, which provided

28 that it could reopen proceedings sua sponte "in exceptional

situations," provided a meaningful standard for review of agency

actions where the "exceptional situations" standard is used

throughout federal immigration law and courts routinely decide

challenges to the BIA's exercise of discretion under that

standard.  Id. at 844-45.  In Beno, the Ninth Circuit found that

the statute allowing the Secretary of Health and Human Services to

waive certain federal laws related to California's Medicaid plain

provided "a meaningful standard by which to judge the Secretary's

waiver," where it allowed "waivers only for the period and extent

necessary to implement experimental projects which are 'likely to

assist in promoting the objectives' of the AFDC program,"

objectives that were set out with specificity elsewhere in federal

law.  30 F.3d at 1067.  In Keating v. Federal Aviation Admin., 610

F.2d 611 (9th Cir. 1980), the Ninth Circuit considered a statute

that provided that the Federal Aviation Administration (FAA)

administrator "may grant exemptions" to pilots excusing compliance

with certain regulations "if he finds that such action would be in

the public interest."  Id. at 612.  The court held "that the

'public interest' standard provides law to be applied by the

administrator sufficient to permit judicial review."  Id.

    Here, as noted, the IQA requires the OMB to issue guidelines

that "provide policy and procedural guidance" on "ensuring and

maximizing the quality, objectivity, utility, and integrity of

information" disseminated by agencies.  44 U.S.C. § 3516, note.

However, it provides no standard by which the content of the

guidelines is to be measured.  Accordingly, the Court holds, like

the court in Missouri River, that the IQA provides no substantive

standards by which to evaluate whether the OMB and DOJ regulations

United States District Court
For the Northern District of California

could exclude press releases from the covered dissemination of information.

Further, the IQA and agency guidelines do not create a meaningful standard by which to review DOJ's denial of Plaintiff's requests for correction.  The IQA is silent on the standards by which an affected person's request for correction should be judged.  The OMB guidelines provide that agencies "are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved," which is akin to saying that the decision is committed to the agency's discretion.  The DOJ guidelines also reserve to the agency wide discretion in how to respond to a request for correction and repeats language similar to the OMB guidelines.  It also provides that DOJ "is not required to change, or in any way alter, the content or status of information simply based on the receipt of a request for correction."  Accordingly, like the district court in <u>Salt Institute</u>, this Court holds that the IQA and agency guidelines grant sufficient discretion to the DOJ to preclude judicial review under the APA.

Thus, because there was no final agency action and the denial was committed to agency discretion by law, the Court GRANTS Defendants' motion to dismiss in its entirety.[3]  Because amendment would be futile, the Court does not grant Plaintiff leave to amend.

---

[3] Because the Court grants Defendants' motion in full on other grounds, it does not reach their implied preclusion argument, in which they contend that the IQA's statutory scheme demonstrates that Congress intended to preclude judicial review through its creation of an alternative review procedure.

United States District Court
For the Northern District of California

II.  Plaintiff's Motion for Summary Judgment

     Because the Court grants Defendants' motion to dismiss,
Plaintiff's cross-motion for summary judgment is moot.  However,
because the parties have briefed the issues extensively, the
Court briefly remarks on several arguments made by the parties
and notes that, had it reached the merits of Plaintiff's motion,
it would have denied it.

     A. Legal Standard

     Summary judgment is properly granted when no genuine and
disputed issues of material fact remain, and when, viewing the
evidence most favorably to the non-moving party, the movant is
clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);
Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.
1987).

     The moving party bears the burden of showing that there is no
material factual dispute.  Therefore, the court must regard as
true the opposing party's evidence, if supported by affidavits or
other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,
815 F.2d at 1289.  The court must draw all reasonable inferences
in favor of the party against whom summary judgment is sought.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952
F.2d 1551, 1558 (9th Cir. 1991).

     B. Statute of Limitations

     Defendants contend that Plaintiff's motion for summary
judgment on his second and third claims, facial challenges to the
lawfulness of the OMB and DOJ guidelines, must be denied because

United States District Court
For the Northern District of California

1  they are time-barred.  This argument was not raised in their

2  motion to dismiss.

3      The Ninth Circuit has held that, if a "person wishes to bring

4  a policy-based facial challenge" to a government decision, the

5  challenge "must be brought within six years of the decision."

6  Wind River Mining Corp. v. United States, 946 F.2d 710, 715 (9th

7  Cir. 1991) (holding that the general six-year statute of

8  limitations for civil actions brought against the United States,

9  28 U.S.C. § 2401(a), applies to actions for judicial review

10  brought under the APA).  "If, however, a challenger contests the

11  substance of an agency decision as exceeding constitutional or

12  statutory authority, the challenger may do so later than six years

13  following the decision by filing a complaint for review of the

14  adverse application of the decision to the particular challenger."

15  Id.

16      The OMB and DOJ guidelines were both issued in 2002, more

17  than nine years before Plaintiff initiated this suit.  Plaintiff

18  conceded at oral argument that his second and third claims are

19  time-barred.  The parties agree that Plaintiff's first claim,

20  which presents an as-applied challenge based on the denial of his

21  requests for correction, is timely because the denials took place

22  in 2010 and 2011, less than six years before he initiated this

23  action.

24      C. Accuracy of the Press Release

25      Plaintiff claims that DOJ "abandoned" its reliance on the

26  accuracy of the press release when Jarrett denied his requests for

27  reconsideration.  The Court finds it did not.  In the responses to

28  the requests for reconsideration, Jarrett did not explicitly

United States District Court
For the Northern District of California

repudiate the position that the challenged statements in the press release were accurate.  Instead, he explained that the requests for reconsideration had not persuaded him to change the determination that the information was not covered by the guidelines and the guidelines did not require any substantive response to such requests, even though he had provided one.  That he did not repeat the reasons that he determined that the press release was accurate did not mean that DOJ abandoned the reasoning.

Under the APA, DOJ's denial of the petitions for correction "may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Save the Peaks Coal. v. United States Forest Serv., 669 F.3d 1025, 1035 (2012) (quoting Se. Alaska Conservation Council v. Fed. Highway Admin., 649 F.3d 1050, 1056 (9th Cir. 2011)).  "Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for the agency's judgment."  Id. (citations omitted).

In the first request for correction, Plaintiff attacked what he believed to be a suggestion in the press release that he "falsif[ied] test results," arguing that the government had always conceded that he had not falsified the data from the study.  In DOJ's response to the request for correction, it explained that, although it agreed that he did not change the data, the press release did not say that he falsified the data, but rather the results.  It explained that Plaintiff's false statements about the data's meaning and the conclusions to be drawn from the data "were part and parcel of the results," and thus it was accurate to say

that he falsified the results.  Thus, even if the agency
guidelines had encompassed press releases, Plaintiff has not
established that DOJ's conclusion that this statement was accurate
and did not warrant correction was arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law.

In the second request for correction, Plaintiff challenged
the statement that his conduct "served to divert precious
financial resources from the VA's critical mission of providing
healthcare to this nation's military veterans."  DOJ denied this
request, noting that this "accurately described the government's
position."  Haddad Decl. ¶ 11, Compl., Ex. 10, 2.  Although the
court subsequently found, more than a year and a half after the
challenged press release was issued, that the prosecution had not
introduced evidence sufficient to meet its burden to prove for
sentencing enhancement purposes that an actual loss had occurred,
this does not mean that no financial resources were diverted.
Plaintiff points to no authority that requires the government to
establish the truth of anything that it puts into a press release
at the same standard at which it must prove sentencing
enhancements in court.  Accordingly, even if the agency guidelines
encompassed press releases, Plaintiff has not established that the
denial of his second request for correction was an abuse of
discretion, arbitrary, capricious or contrary to the law.

CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion to dismiss (Docket No. 8) and DENIES as moot Plaintiff's motion for summary judgment (Docket No. 21).

The Clerk shall enter judgment and close the file. Defendants shall recover their costs from Plaintiff.

IT IS SO ORDERED.

Dated: 12/3/2012

CLAUDIA WILKEN
United States District Judge